IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division



WILBERT GILCHRIST,

    Plaintiff,

v.                                                    Civil Action No. **3:14CV630**

JOHN DOE, *et al.*,

    Defendants.

## MEMORANDUM OPINION

Wilbert Gilchrist, a Virginia inmate proceeding *pro se* and *in forma pauperis*, filed this 42 U.S.C. § 1983 action.[1] By Memorandum Opinion and Order entered on January 27, 2016, the Court dismissed all claims in the action against all Defendants except for Claim One against Defendants Edson and Doe and Claim Two against Defendant M. Oslin. *Gilchrist v. Kiser*, No. 3:14CV630, 2016 WL 354752, at *4 (E.D. Va. Jan. 27, 2016). Subsequently, Gilchrist identified Defendant Doe to be Defendant Lard. (ECF No. 45, at 5.) By Memorandum Opinion and Order entered on July 11, 2016, the Court granted the Motion for Summary Judgment filed by Defendant Oslin, dismissed Claim Two, and dismissed all claims against Defendant Edson without prejudice because of Gilchrist's failure to serve him. *Gilchrist v. Doe*, No. 3:14CV630, 2016 WL 3766313, at *5 (E.D. Va. July 11, 2016). This matter is before the Court on Defendant

---

[1] The statute provides, in pertinent part:

> Every person who, under color of any statute . . . of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law . . . .

42 U.S.C. § 1983.

Lard's Motion for Summary Judgment. (ECF No. 71). Gilchrist has responded. (ECF No. 77.) For the reasons stated below, Defendant Lard's Motion for Summary Judgment will be GRANTED.

## I. SUMMARY OF ALLEGATIONS

In his Particularized Complaint,[2] Gilchrist alleges the following with regard to Defendant Lard:

> Dr. [Lard] exercised deliberate indifference to plaintiff's multiple internal stomach illness[es] by failing to provide adequate medical internal testing and outside examination by a stomach specialist (gastroenterologist). [Dr. Lard] intentionally refused to fulfill any of plaintiff's requests for follow-up care with [a] gastroenterologist. As a result of . . . Dr. [Lard's] deliberate indifference to plaintiff's internal condition, plaintiff suffer[ed] further pain internally as well as mental anguish. He continue[s] to suffer daily from internal bleeding from his rectum off and on as well as several other internal painful daily symptoms.

(Part. Compl. 2, ECF No. 30 (paragraph numbers omitted).) The Court previously construed Gilchrist to raise the following claim for relief against Defendant Lard:

> Claim One: Defendant Lard was deliberately indifferent to Gilchrist's stomach condition by:
> (a) "failing to provide adequate medical internal testing" (*id.*); and,
> (b) failing to send Gilchrist to a gastroenterologist.

(*See* ECF No. 34, at 5.) Gilchrist seeks an unspecified amount of damages.

## II. STANDARD FOR SUMMARY JUDGMENT

Summary judgment must be rendered "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment bears the responsibility of informing the Court of the basis for the motion and identifying the parts of the record which demonstrate the

---

[2] The Court employs the pagination assigned to the Particularized Complaint by the CM/ECF docketing system. The Court corrects the punctuation, spelling, and capitalization and omits the emphasis in quotations from the Particularized Complaint.

absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the pleadings, depositions, answers to interrogatories, and admissions on file." *Id.* at 324 (internal quotation marks omitted). When the motion is properly supported, the nonmoving party must go beyond the pleadings and, by citing affidavits or "'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting former Fed. R. Civ. P. 56(c), (e) (1986)). In reviewing a summary judgment motion, the Court "must draw all justifiable inferences in favor of the nonmoving party." *United States v. Carolina Transformer Co.*, 978 F.2d 832, 835 (4th Cir. 1992) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). However, a mere "'*scintilla* of evidence'" will not preclude summary judgment. *Anderson*, 477 U.S. at 251 (quoting *Improvement Co. v. Munson*, 81 U.S. (14 Wall.) 442, 448 (1872)). "'[T]here is a preliminary question for the judge, not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party . . . upon whom the onus of proof is imposed.'" *Id.* (quoting *Munson*, 81 U.S. at 448). Additionally, "'Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment.'" *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994) (quoting *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915 n.7 (5th Cir. 1992)); *see* Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials . . . .").

In support of his Motion for Summary Judgment, Defendant Lard has submitted: (1) his own declaration (Br. Supp. Mot. Summ. J. Attach. 1 ("Lard Decl."), ECF No. 72–1) and (2)

3

copies of Gilchrist's medical records ("Medical Records," *id.* Attach. 2, ECF Nos. 72–2 through 72–4).

At this stage, the Court is tasked with assessing whether Gilchrist "has proffered sufficient proof, in the form of *admissible* evidence, that could carry the burden of proof of his claim at trial." *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1316 (4th Cir. 1993) (emphasis added). As a general rule, a non-movant must respond to a motion for summary judgment with affidavits or other verified evidence. *Celotex Corp.*, 477 U.S. at 324. Gilchrist's Particularized Complaint has a notary seal but fails to indicate that he was administered an oath.[3] Gilchrist also failed to swear to the contents of the Particularized Complaint under penalty of perjury. The Particularized Complaint thus fails to constitute admissible evidence. *United States v. White*, 366 F.3d 291, 300 (4th Cir. 2004).

Gilchrist's Response to Defendant Lard's Motion for Summary Judgment is comprised of the following: (1) an "AFFIDAVIT IN OPPOSITION TO DEFENDANT MOTION FOR SUMMARY JUDGMENT" ("Gilchrist Affidavit," ECF No. 77), (2) an unsworn document entitled "AFFIDAVIT PART TWO LAW AND ARGUMENT" (ECF No. 77–1), and (3) an unsworn document entitled "EXHIBIT-LEGAL NOTES," to which Gilchrist has attached copies of various medical records that he has annotated, Offender Request Forms, an Offender Diet Order, grievance forms, and the second page from Dr. Lard's Memorandum in Support of Summary Judgment, which Gilchrist has also annotated (ECF Nos. 77–2 through 77–8).

---

[3] Gilchrist's Particularized Complaint does not contain a jurat, but instead was merely acknowledged before a notary. An acknowledgment is used to verify a signature and to prove that an instrument was executed by the person signing it, whereas a jurat is evidence that a person has sworn to the truth of the contents of the document. In an acknowledgment, unlike a jurat, the affiant does not swear under oath nor make statements under penalty of perjury. *See Strong v. Johnson*, 495 F.3d 134, 140 (4th Cir. 2007) (explaining that jurat uses words "subscribed and sworn" and demonstrates an oath was rendered); *Goode v. Gray*, No. 3:07cv189, 2009 WL 255829, at *2 n.6 (E.D. Va. Feb. 3, 2009). Thus, the Particularized Complaint fails to constitute admissible evidence.

However, "[i]t is well established that unsworn, unauthenticated documents cannot be considered on a motion for summary judgment." *Orsi v. Kirkwood*, 999 F.2d 86, 92 (4th Cir. 1993) (citation omitted). "For documents to be considered, they 'must be authenticated by and attached to an affidavit' that meets the strictures of Rule 56." *Campbell v. Verizon Va., Inc.*, 812 F. Supp. 2d 748, 750 (E.D. Va. 2011) (quoting *Orsi*, 999 F.2d at 92). All of Gilchrist's submissions except his Affidavit run afoul of these rules. Accordingly, the Court will only consider Gilchrist's Affidavit in connection with the Motion for Summary Judgment.

In light of the foregoing principles and submissions, the following facts are established for the purposes of the Motion for Summary Judgment. All permissible inferences are drawn in favor of Gilchrist.

### III. RELEVANT FACTS

Gilchrist arrived at Keen Mountain Correctional Center ("KMCC") on March 3, 2015. (Medical Records 1, ECF No. 72–2.)[4] During intake, Gilchrist told medical staff that he suffered from a "very serious stomach problem." (*Id.*)

The next day, during sick call, Gilchrist complained to a nurse that he had blood in his stool. (Lard Decl. ¶ 13; Medical Records 2.) The nurse noted that Gilchrist was not in acute distress. (Medical Records 2.) The nurse gave Gilchrist three hemoccult cards[5] and placed him on the doctor's list for further evaluation. (*Id.*; *see also* Lard Decl. ¶ 13.)

On March 5, 2015, Gilchrist gave two hemoccult cards to a nurse at KMCC. (Medical Records 2.) Both were positive for blood. (*Id.*) Later that day, a doctor evaluated Gilchrist for

---

[4] The Medical Records are located at ECF Nos. 72–2 through 72–4. The Court employs the "WRSP 001," which is the pagination assigned to the Medical Records by Wallens Ridge State Prison. However, the Court omits the initial zeros from the pagination when referring to the Medical Records.

[5] "Hemoccult cards are used to test for blood in the stool." (Lard Decl. ¶ 15.)

"complain[ts] of blood in his stool, cramps, diarrhea and painful defecation." (Lard Decl. ¶ 17; Medical Records 2.) The doctor's impression was that Gilchrist suffered from severe irritable bowel syndrome ("IBS"). (Lard Decl. ¶ 17; Medical Records 2.) After reviewing Gilchrist's records, the doctor noted that Gilchrist had a normal colonoscopy and esophagogastroduodenoscopy ("EGD")[6] in 2012 and 2013. (Lard Decl. ¶ 17; Medical Records 2.) The doctor "discussed at length that Gilchrist did not have ulcertative colitis." (Lard Decl. ¶ 17.) Gilchrist "agreed to pursue treatment with neurologic/psych medications due to [the] ineffectiveness of anticholinergics." (*Id.*; *see* Medical Records 3.)[7]

On March 10, 2015, the doctor who had evaluated Gilchrist "contacted the psychiatric department to discuss the benefits of treatment with Elavil 10mg for Gilchrist's severe IBS . . . ." (Lard Decl. ¶ 25.) The doctor did not want to start Gilchrist on Elavil "without involvement of the psychological department" because of Gilchrist's history of bipolar disorder. (*Id.*) The next day, "the psychiatric department reported that Gilchrist had not been on any psychotropic medications since March 2014, and when he was prescribed these medications he was only 40% compliant." (*Id.* ¶ 26; *see* Medical Records 19.) The department "asked the doctor to proceed with the treatment suggested." (Lard Decl. ¶ 26; *see* Medical Records 19.)

On March 12, 2015, a doctor at KMCC examined Gilchrist because of Gilchrist's complaints of "weight loss and the inability to eat certain foods." (*Id.* ¶ 27.) Gilchrist "had positive bowel sounds and tenderness in the left upper quadrant." (*Id.*; *see* Medical Records 4.) The doctor did not locate any palpable masses. (Medical Records 4.) The doctor noted that

---

[6] "An EGD is a test to examine the lining of the esophagus, stomach and first part of the small intestine. It is used to diagnose and treat problems in the upper gastrointestinal ("GI") tract." (Lard Decl. ¶ 23.)

[7] "Anticholinergics are a class of drug to block the action of the neurotransmitter acetylcholine in the brain. They are used to treat diseases like asthma, incontinence, gastrointestinal cramps and muscular spasms." (Lard Decl. ¶ 24.)

Gilchrist's 2013 EGD had normal results "other than a non-obstructing Schatski ring in the lower 1/3 of the esophagus." (Lard Decl. ¶ 27.) The doctor diagnosed Gilchrist with leg swelling and IBS. (Medical Records 5.) Gilchrist's diet order was modified, and the doctor prescribed Elavil. (*Id.*)

On April 24, 2015, a nurse saw Gilchrist for his complaint that his medication was not helping with weight loss. (*Id.* at 6.) Gilchrist refused to have his vital signs taken. (Lard Decl. ¶ 29.) The nurse referred him to a doctor for evaluation. (Medical Records 6.)

A doctor evaluated Gilchrist on April 30, 2015. (*Id.*) Gilchrist told the doctor that he had not taken his Elavil "as prescribed to treat his IBS because another inmate told him that Elavil was the same medication given by the psychiatric department at a regional jail." (Lard Decl. ¶ 30.) Despite telling the doctor he only took Elavil one time, a couple of minutes later, Gilchrist told the doctor that he had not taken the Elavil because it made him itch. (Medical Records 6.) Gilchrist also complained that he was receiving beans and cabbage, which he believed should not be part of his diet. (*Id.*) The doctor explained that Gilchrist's current diet order, which only prohibited red meat, was based upon Gilchrist's reports of being able to tolerate all other foods. (*Id.*) Gilchrist produced his old diet order from a prior facility for an ulcerative colitis diet, and the doctor explained to Gilchrist he "does not have this diagnosis but rather IBS (which [they] had extensively discussed [at] prior visit)." (*Id.* at 7.) The doctor stated that it was difficult to believe Gilchrist's complaints because of his conflicting reports of what foods he could or could not eat. (*Id.*) The doctor explained that he or she could provide a different medication for IBS and Gilchrist replied, "'So you're saying there is nothing wrong with me' and began to walk away." (*Id.*) The doctor also noted that Gilchrist was compliant with his medications only 38% of the time. (*Id.*)

During sick call on July 7, 2015, Gilchrist complained that he was experiencing internal bleeding, his esophagus hurt when he ate, and he had a knot under his left rib by his kidney. (*Id.* at 8.) Gilchrist also wanted to be checked for prostate cancer. (*Id.*) He was placed on the list to see the doctor. (Lard Decl. ¶ 32.)

Gilchrist saw a doctor on July 9, 2015, for "multiple complaints including issues with urination, decrease of blood in stool, burning anus with bowel movements, use of hemorrhoid cream, difficulty swallowing, and heartburn." (*Id.* ¶ 34.) Upon examination, the doctor noted that Gilchrist had a soft and flat abdomen with positive bowel sounds. (*Id.*; *see* Medical Records 9.) Gilchrist had no palpable masses, and his suprapubic area was not tender. (Lard Decl. ¶ 34; *see* Medical Records 9.) The doctor noted that Gilchrist would be scheduled for blood work and a rectal examination to address his concerns of prostate cancer. (Lard Decl. ¶ 34.) The doctor also ordered that Gilchrist undergo a stool test. (Medical Records 9.) The doctor prescribed a 90-day supply of Ranitidine, Omeprazole, and hemorrhoid ointment to address Gilchrist's gastrointestinal issues. (*Id.*)

Gilchrist's stool and blood tests came back negative. (Lard Decl. ¶¶ 36–37.) Gilchrist failed to show up for sick call on August 7 and 17, 2015. (*Id.* ¶ 38; *see* Medical Records 10.)

Gilchrist saw a doctor on August 27, 2015 for a rectal examination. (Medical Records 10.) The doctor noted increased rectal tone with no masses and no tenderness. (*Id.*) The palpable portion of Gilchrist's prostate was normal. (*Id.*) Only thin mucous was on the doctor's glove. (*Id.*) Gilchrist continued to ask the doctor if he could see a specialist. (*Id.*) Gilchrist declined to receive prescription medication for his IBS. (*Id.*)

On September 15, 2015, Gilchrist presented at sick call with complaints of acid reflux and blood in his stool and urine. (Lard Decl. ¶ 41.) Gilchrist was alert and oriented, and he did

8

not demonstrate signs of acute distress. (*Id.*) His vital signs were normal. (*Id.*) Gilchrist was placed on the list to see the doctor. (*Id.*)

Defendant Lard first saw Gilchrist on September 17, 2015. (*Id.* ¶ 42.) On that date, Gilchrist complained of pain in his upper left quadrant and blood in his stool and urine. (*Id.*; *see* Medical Records 11.) He "reported that his symptoms were variable with food." (Lard Decl. ¶ 42.) Defendant Lard noted that Gilchrist was not in acute distress. (*Id.*) He ordered blood work, a urinalysis, and a stool occult test. (*Id.*)

Gilchrist had blood drawn on September 24, 2015. (Medical Records 12.) He was unable to void so he was given a specimen cup. (*Id.*) Gilchrist's stool occult test was positive for blood in the stool. (Lard Decl. ¶ 45.) Accordingly, Gilchrist's medications—hemorrhoid ointment, Finasteride, Ranitidine, and Omeprazole—were renewed on September 27, 2015. (*Id.*; *see* Medical Records 12.)

Defendant Lard reviewed Gilchrist's medical chart on September 29, 2015, because Gilchrist "continued to make the same complaints that he made with other doctors within the Department of Corrections." (Lard Decl. ¶ 46.) Defendant Lard recommended that Gilchrist have a digital rectal examination with a stool occult test. (*Id.*)

Defendant Lard was deployed overseas with the National Guard from October 7, 2015 until January 28, 2016. (*Id.* ¶ 48.) During this time, other doctors provided treatment to Gilchrist. On December 10, 2015, a doctor at KMCC recommended that Gilchrist use Preparation H and that he also receive a gastroenterology consultation for recurrent abdominal pain, gastroesophageal reflux disease ("GERD"), and IBS. (*Id.* ¶ 49; *see* Medical Records 13.) This doctor also recommended that Gilchrist avoid processed meat and that he undergo blood work and a stool test. (Lard Decl. ¶ 49; *see* Medical Records 13.)

Gilchrist's lab results came back on December 18, 2015. (Lard Decl. ¶ 52.) Based on those results, a doctor ordered prednisone, and Gilchrist was added to the list to see the doctor. (*Id.*) This provider "also recommended a gastroenterology consultation to assess abdominal pain, GERD and IBS." (*Id.*)

On December 24, 2015, a doctor examined Gilchrist at his bedside for complaints of abdominal pain, as well as hand and leg swelling. (*Id.* ¶ 54; *see* Medical Records 14.) The doctor requested a gastroenterology consultation and ordered that Gilchrist have blood tests for rheumatoid arthritis. (Lard Decl. ¶ 54.)

On January 29, 2016, Gilchrist saw an outside provider for his IBS. (Lard Decl. ¶ 58.) This provider recommended that Gilchrist have an outside consultation for a colonoscopy and an EGD. (*Id.*)

Defendant Lard returned to work on February 2, 2016. (*Id.* ¶ 59.) He reviewed Gilchrist's chart, and the outside consultation request was approved and scheduled for March 21, 2016. (*Id.* ¶ 60.)

On February 10, 2016, Defendant Lard saw Gilchrist for knee pain. (Lard Decl. ¶ 62; Medical Records 16.) Gilchrist did not have any complaints about GI issues at that time. (Lard Decl. ¶ 62.)

On March 10, 2016, Defendant Lard saw Gilchrist for knee pain and dietary complaints. (*Id.* ¶ 64; *see* Medical Records 16.) Defendant Lard told Gilchrist "that he should select appropriate foods based on what is provided." (Lard Decl. ¶ 64; *see* Medical Records 16–17.)

On March 21, 2016, Gilchrist was taken to the Clinch Valley Medical Center for an EGD and colonoscopy with biopsy. (Lard Decl. ¶¶ 66, 71; Medical Records 53–57, ECF No. 72–4.) Gilchrist's EGD showed a normal esophagus and gastroesophageal junction. (Medical Records

53.) The doctor noted that Gilchrist had a small hiatal hernia and mild gastritis in the gastric antrum. (*Id.*) Gilchrist's duodenum appeared normal. (*Id.*) Gilchrist's colonoscopy showed a "normal appearing colon" with normal mucosa in the terminal ileum. (*Id.* at 55.) The doctor recommended that Gilchrist be prescribed 40 mg of Nexium, return to the center for a follow-up in two weeks, and return in ten years for another colonoscopy. (*Id.* at 54, 56.) Because "[t]he Department of Corrections uses Prilosec to treat its population[,] Gilchrist received Prilosec to treat his conditions." (Lard Decl. ¶ 70.)[8] Defendant Lard avers that, given Gilchrist's results from the March 21, 2016 EGD and colonoscopy, he "did not suffer any injury in having the outside consultation performed in March 2016, rather than some time in early 2016." (*Id.* ¶ 61.)

On April 11, 2016, Gilchrist presented at sick call with complaints about his IBS. (Medical Records 18, ECF No. 72–2.) A provider noted that Gilchrist was not in acute distress, that he was oriented, and that his respiration was even and unlabored. (*Id.*) Gilchrist was placed on the list to see a doctor for further evaluation. (*Id.*) Defendant Lard determined that, "[b]ased on Gilchrist's physical presentation, his subjective complaints and [Defendant Lard's] examination, it was not medically necessary for Gilchrist to receive additional treatment by outside providers." (Lard Decl. ¶ 76.)[9]

On April 14, 2016, Gilchrist was transferred from KMCC to Wallens Ridge State Prison. (*Id.* ¶ 77.)

## IV. ANALYSIS

To survive a motion for summary judgment on an Eighth Amendment claim, Gilchrist must demonstrate that Defendant Lard acted with deliberate indifference to his serious medical

---

[8] Both Nexium and Prilosec are used to "treat[] gastroesophageal reflux disease and other conditions involving excessive stomach acid." (Lard Decl. ¶¶ 68–69.)

[9] Gilchrist contends that Defendant Lard "has yet to see to it that [Gilchrist has his] recommended follow-up with the GI specialist Dr. William C. Hunter . . . ." (Gilchrist Aff. ¶ 3.)

needs. *See Brown v. Harris*, 240 F.3d 383, 388 (4th Cir. 2001). A medical need is "serious" if it "'has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008) (quoting *Henderson v. Sheahan*, 196 F.3d 839, 846 (7th Cir. 1999)). For purposes of this matter, Defendant Lard "acknowledges that [Gilchrist's] severe IBS constitutes a serious medical need." (Br. Supp. Mot. Summ. J. 12.)

The subjective prong of a deliberate indifference claim requires the plaintiff to demonstrate that a particular defendant actually knew of and disregarded a substantial risk of serious harm to his person. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994). "Deliberate indifference is a very high standard—a showing of mere negligence will not meet it." *Grayson v. Peed*, 195 F.3d 692, 695 (4th Cir. 1999) (citing *Estelle v. Gamble*, 429 U.S. 97, 105–06 (1976)).

> [A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Farmer*, 511 U.S. at 837. *Farmer* teaches "that general knowledge of facts creating a substantial risk of harm is not enough. The prison official must also draw the inference between those general facts and the specific risk of harm confronting the inmate." *Johnson v. Quinones*, 145 F.3d 164, 168 (4th Cir. 1998) (citing *Farmer*, 511 U.S. at 837). Thus, to survive a motion for summary judgment under the deliberate indifference standard, a plaintiff "must show that the official in question subjectively recognized a substantial risk of harm. . . . [and] that the official in question subjectively recognized that his actions were 'inappropriate in light of that risk.'"

12

*Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 303 (4th Cir. 2004) (quoting *Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997)).

In evaluating a prisoner's complaint regarding medical care, the Court is mindful that, "society does not expect that prisoners will have unqualified access to health care" or to the medical treatment of their choosing. *Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (citing *Estelle*, 429 U.S. at 103–04). Absent exceptional circumstances, an inmate's disagreement with medical personnel with respect to a course of treatment is insufficient to state a cognizable constitutional claim. *See Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985) (citing *Gittlemacker v. Prasse*, 428 F.2d 1, 6 (3d Cir. 1970)).

### A. Failure to Provide Adequate Medical Internal Testing

In Claim One (a), Gilchrist alleges that Defendant Lard failed "to provide adequate medical internal testing" for Gilchrist's stomach condition. (Compl. ¶ 3.) As discussed below, Gilchrist fails to demonstrate that Defendant Lard subjectively recognized a serious risk of harm to Gilchrist and chose to ignore that risk.

The record establishes that Gilchrist received a great deal of medical care for his medical issues. As noted above, Defendant Lard first treated Gilchrist on September 17, 2015. (Lard Decl. ¶ 42.) Prior to this, Gilchrist was continuously treated by other providers at KMCC. While Gilchrist contends that he did not receive any medications for his condition, the record reflects that in March of 2015, a doctor at KMCC prescribed Elavil to treat Gilchrist's IBS. (Medical Records 5, 19; Lard Decl. ¶¶ 25–27.) However, Gilchrist was only compliant with his medications 38% of the time (Medical Records 7), and he told the doctor that he had not taken his Elavil "because another inmate told him that Elavil was the same medication given by the

psychiatric department at a regional jail." (Lard Decl. ¶ 30.) Gilchrist also had several blood and stool tests and a rectal examination performed. (Medical Records 9–10.)

On September 17, 2015, when Defendant Lard first saw Gilchrist, Defendant Lard ordered that Gilchrist receive blood work, a urinalysis, and a stool occult test. (Lard Decl. ¶ 42.) Defendant Lard also renewed Gilchrist's prescriptions for hemorrhoid ointment, finasteride, ranitidine, and omeprazole. (*Id.* ¶ 45; Medical Records 12.) He also recommended that Gilchrist undergo a digital rectal examination with a stool occult test. (Lard Decl. ¶ 46.) When Defendant Lard returned from being deployed overseas, he scheduled Gilchrist to see an outside provider on March 21, 2016 to receive an EGD and colonoscopy with biopsy. (*Id.* ¶¶ 60, 66, 71.) Defendant Lard continued to see Gilchrist until Gilchrist was transferred to Wallens Ridge State Prison on April 14, 2016. (*Id.* ¶¶ 62, 64, 76; Medical Records 16, 18.)

Overall, the uncontroverted evidence establishes that Defendant Lard was not deliberately indifferent to Gilchrist's stomach condition. On the contrary, other than the period during which he was deployed overseas, Defendant Lard provided continuous care to Gilchrist from September 17, 2015 until Gilchrist was transferred on April 14, 2016. Gilchrist fails to suggest what more Defendant Lard should have done to treat his IBS. At most, Gilchrist has alleged a disagreement with the course of treatment provided to him by Defendant Lard, which is insufficient to maintain his Eighth Amendment claim against Defendant Lard. *See Wright*, 766 F.2d at 849 (citing *Gittlemacker*, 428 F.2d at 6). Because Gilchrist has failed to demonstrate that Defendant Lard acted with deliberate indifference, Claim One (a) will be DISMISSED.[10]

---

[10] In his Particularized Complaint, Gilchrist also alleges that he "has not received any pain medications for his stomach illness." (Part. Compl. 3.) Gilchrist also claims that he has lost 50 pounds and that "his medical food diet still has not been corrected." (*Id.*) However, the record reflects that Gilchrist has received abundant care for his medical conditions, including an appropriate diet that prohibited red meat. (*See* Medical Records 6.) Gilchrist's old ulcerative colitis diet order was no longer appropriate because Gilchrist was no longer diagnosed with

### B.  Failure to Send Gilchrist to a Gastroenterologist

In Claim One (b), Gilchrist faults Defendant Lard for failing to send him to a gastroenterologist for further evaluation of his stomach condition. As noted above, this assertion is also refuted by the record. On January 29, 2016, while Defendant Lard was deployed overseas with the National Guard, Gilchrist saw an outside provider for his IBS. (Lard Decl. ¶ 58.) This provider recommended that Gilchrist have an outside consultation for a colonoscopy and EGD. (*Id.*) When Defendant Lard returned from overseas, he obtained approval for Gilchrist to see an outside provider on March 21, 2016. (*Id.* ¶ 60.) Gilchrist saw Dr. William Hunter, a specialist, at the Clinch Valley Medical Center for an EGD and colonoscopy with biopsy. (Medical Records 53–57; Lard Decl. ¶¶ 66, 71.)

To the extent that Gilchrist faults Defendant Lard for delaying a consultation with an outside provider, Gilchrist must also establish that the delay in the provision of medical care "resulted in substantial harm." *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005) (quoting *Oxendine v. Kaplan*, 241 F.3d 1272, 1276 (10th Cir. 2001)); *id.* at 754 (quoting *Sealock v. Colorado*, 218 F.3d 1205, 1210 (10th Cir. 2000); *see Webb v. Hamidullah*, 281 F. App'x 159, 166–67 n.13 (4th Cir. 2008) (explaining that where an Eighth Amendment claim is predicated on a delay in the provision of medical care, the plaintiff must demonstrate "that the delay resulted in substantial harm" (quoting *Sealock*, 218 F.3d at 1210)). "[T]he substantial harm requirement

---

colitis. (*Id.* at 7.) Gilchrist fails to demonstrate any deliberate indifference by Defendant Lard with respect to these conditions. Moreover, any harm Gilchrist has suffered stems not from deliberate indifference from any doctor, but from Gilchrist's own refusal to follow medical orders and comply with his medications. (*See id.*)

In the Gilchrist Affidavit, Gilchrist claims that various medical personnel are "deliberately refus[ing] to acknowledge [his] . . . hiatal hernia at all or [his] one year no bean diet." (ECF No. 77, at 2.) Gilchrist failed to include this as a claim in his Particularized Complaint. To the extent this claim is properly before the Court, it is vague and conclusory, and Gilchrist fails to demonstrate that he notified Defendant Lard about these conditions or that Defendant Lard ignored them.

may be satisfied by lifelong handicap, permanent loss, or considerable pain." *Garrett v. Stratman*, 254 F.3d 946, 950 (10th Cir. 2001) (citations omitted); *see Coppage v. Mann*, 906 F. Supp. 1025, 1037 (E.D. Va. 1995) (quoting *Monmouth Cty. Corr. Inst'l Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987)). As explained below, Gilchrist fails to demonstrate that any delay in scheduling the outside consultation resulted in substantial harm.

On December 10, 2015, while Defendant Lard was deployed overseas with the National Guard, another doctor at KMCC recommended that Gilchrist receive a gastroenterology consultation for recurrent abdominal pain, GERD, and IBS. (Lard Decl. ¶ 49; Medical Records 13.) Gilchrist saw an outside provider on January 29, 2016, and that provider recommended that Gilchrist have an outside consultation to receive a colonoscopy and an EGD. (Lard Decl. ¶ 58.) Gilchrist did not see Dr. Hunter for those procedures until March 21, 2016. (*Id.* ¶¶ 66, 71; Medical Records 53–57.) Although Gilchrist experienced some pain during this period, the record fails to indicate that the pain was attributable to any delay in scheduling the outside consultation by Defendant Lard. Rather, Defendant Lard requested that an outside consultation be scheduled for Gilchrist almost immediately after he returned to work on February 2, 2016. Moreover, Defendant Lard concluded that, based upon the results obtained from Gilchrist's March 21, 2016 EGD and colonoscopy, Gilchrist "did not suffer any injury in having the outside consultation performed in March 2016, rather than some time in early 2016." (Lard Decl. ¶ 61.)

In the Gilchrist Affidavit, Gilchrist also appears to fault Defendant Lard for failing to ensure that he saw Dr. Hunter for a follow-up evaluation two weeks after March 21, 2016. (Gilchrist Aff. ¶ 3.) While Gilchrist may have experienced some pain after the consultation, the record fails to establish that any pain was attributable to the failure to conduct the follow-up appointment. Instead, Defendant Lard concluded that "[b]ased on Gilchrist's physical

presentation, his subjective complaints and [Defendant Lard's] examination, it was not medically necessary for Gilchrist to receive additional treatment by outside providers." (Lard Decl. ¶ 76.) Gilchrist fails to provide any evidence to suggest that Defendant Lard was actually aware that Gilchrist faced a substantial risk of serious harm from a delay in scheduling the outside consultation and the failure to see Dr. Hunter for a follow-up appointment. *See Farmer*, 511 U.S. at 837. Accordingly, Claim One (b) will be DISMISSED.[11]

## V. CONCLUSION

For the foregoing reasons, Defendant Lard's Motion for Summary Judgment (ECF No. 71) will be GRANTED. Claim One and the action will be DISMISSED.

An appropriate Order will accompany this Memorandum Opinion.

/s/ *[signature]*
Roderick C. Young
United States Magistrate Judge

Date: March 31, 2017
Richmond, Virginia

---

[11] In his "AFFIDAVIT PART TWO LAW AND ARGUMENT," Gilchrist continues to complain that medical staff at Wallens Ridge State Prison "continue to deny and delay me to needed outside appropriate medical treatment causing me severe internal multiple pains off and on daily." (ECF No. 77–1, at 2.) The Court previously informed Gilchrist that "[a]ny Wallens Ridge State Prison defendant likely resides in the Western District of Virginia . . . ." (*See* ECF No. 60, at 10 n.10.) The Court again advises Gilchrist that the proper venue for any action against the medical staff at Wallens Ridge State Prison would likely be in the Western District of Virginia.